Marcus A. Helt (TX 24052187)
Evan R. Baker (TX 24073879)
**GARDERE WYNNE SEWELL LLP**
3000 Thanksgiving Tower
1601 Elm Street
Dallas, TX 75201-4761
Telephone:  (214) 999-3000
Facsimile:  (214) 999-4667
mhelt@gardere.com
ebaker@gardere.com

**PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **COLOR STAR GROWERS OF** | § | **Case No. 13-42959** |
| **COLORADO, INC., VAST, INC., and** | § | |
| **COLOR STAR, LLC,** | § | **(Jointly Administered)** |
| | § | |
| Debtors. | § | **Hearing Date: January 21, 2014** |
| | § | **at 3:30 p.m.** |

### APPLICATION TO AUTHORIZE EMPLOYMENT OF SSG ADVISORS, LLC TO PROVIDE INVESTMENT BANKING SERVICES TO THE DEBTORS PURSUANT TO 11 U.S.C. § 327 AND §328 (a) EFFECTIVE AS OF THE PETITION DATE

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 21, 2014 AT 3:30 P.M. IN THE UNITED STATES BANKRUPTCY FOR THE EASTERN DISTRICT OF TEXAS BEFORE THE HONORABLE BRENDA T. RHOADES, CHIEF BANKRUPTCY JUDGE, AT 660 NORTH CENTRAL EXPRESSWAY, PLANO, TEXAS.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-THREE DAYS, WHICH IS JANUARY 20, 2014, FROM THE DATE YOU WERE SERVED WITH THIS PLEADING.   YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE,**

**THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Color Star Growers of Colorado, Inc., a Colorado corporation ("**Color Star**"), Vast, Inc., a Texas corporation ("**Vast**"), and Color Star, LLC ("**CSLLC**," collectively with Color Star and Vast, the "**Debtors**"), debtors and debtors-in-possession in the above-captioned cases, hereby submit this application (the "**Application**") for authorization (i) to employ SSG Advisors, LLC ("**SSG**") from and after the Petition Date to investment banking services to the Debtors as more fully described below pursuant to 11 U.S.C. § 327 and 328 (a) of the Bankruptcy Code[1].  SSG began its employment with the Debtors on September 25, 2013, and since that time has worked with the Debtors to evaluate strategic alternatives, including identifying and contacting potential acquirers for the Company and its assets.

**I.**
**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over these chapter 11 cases and the Application pursuant to 28 U.S.C. §§ 1334 and 157(b).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Debtors are operating as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1008.  No trustee, examiner or statutory creditors' committee has been appointed in these chapter 11 cases.

**II.**
**BACKGROUND**

3.      On December 15, 2013 (the "**Petition Date**"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), thereby initiating their Bankruptcy Cases and creating their respective bankruptcy estates (the "**Estates**").

---

[1] References to the Bankruptcy Code mean 11 U.S.C. §§ 101, *seq.*

**APPLICATION TO AUTHORIZE EMPLOYMENT OF SSG ADVISORS, LLC TO PROVIDE INVESTMENT BANKING SERVICES TO THE DEBTORS PURSUANT TO 11 U.S.C. § 327 AND 328 (a) EFFECTIVE AS OF THE PETITION DATE – Page 2**
Gardere01 - 6394663v.4

4.    This Application is further supported by the evidence *et* contained in the *Declaration of Matthew P. Karlson in Support of Application to Authorize Employment of SSG Advisors, LLC to provide Investment Banking services to the Debtors Pursuant to 11 U.S.C. § 327 and 328 (a) Effective as of the Petition Date* (the "**Karlson Declaration**") filed concurrently herewith.

## III.
## RELIEF REQUESTED

5.    By this Application, the Debtors seek authority to employ and retain SSG, effective as of the Petition Date, to assist the Debtors in these chapter 11 cases.  Pursuant to Bankruptcy Code § 327 and 328 (a), the Debtors seek authority to engage SSG to provide investment banking services, on an exclusive basis, focusing on the sale of all or a part of the Debtors' assets ("**Sale**").

**The Debtors' Pre-Petition Engagement of SSG**

6.    On September 25, 2013, the Debtors engaged SSG to provide investment banking services as set forth in the Engagement Contract, attached hereto as **Exhibit A** (the "**Engagement Contract**").  SSG has assisted the Debtors in compiling information necessary to market the Debtors' assets for sale and to date has contacted 69 potential acquirers.  SSG received a $25,000 Initial Fee, and has been paid approximately $75,000 prior to the Petition Date.

## IV.
## SCOPE OF ASSISTANCE TO BE PROVIDED

7.    The Debtors seek authority to engage SSG during these chapter 11 cases to render the critically important services described herein.  SSG will provide the following services:

A) SSG's role in connection with the Sale will include the following:

    i. Prepare an information memorandum describing the Debtors, their historical performance and prospects, including existing contracts, marketing and sales, labor force, management and real estate information;

    ii. Assist the Debtors in compiling a data room of any necessary and appropriate documents related to the Sale;

    iii. Continue to assist the Debtors in identifying additional potential buyers;

    iv. Coordinate the execution of confidentiality agreements for potential buyers wishing to review the information memorandum;

    v. Assist the Debtors in coordinating site visits for interested buyers;

    vi. Solicit competitive offers from potential buyers;

    vii. Advise and assist the Debtors in structuring the transaction and negotiating the transaction agreements;

    viii. Provide testimony in support of the Sale; and

    ix. Otherwise assist the Debtors, their attorneys and financial advisors, as necessary, through closing on a best efforts basis.

B) SSG's role in connection with a Financing will include the following:

    i. Advise, in light of current market conditions, on all aspects of the Financing, including timing, structure and terms;

    ii. Conduct due diligence and complete an executive summary on the Financing, prepare a financing memorandum describing Color Star, its historical performance and prospects, including existing contracts, marketing and sales, labor force, and management and anticipated financial results of the Company;

    iii. Approach potential lenders and investors, including commercial banks, commercial financing companies, private capital investment funds and other institutional investors;

    iv. Solicit term sheets from those lenders and investors interested in the Financing;

    v. Negotiate with lenders and investors regarding the terms and structure of the Financing; and

> vi.  Otherwise assist the Company, its sole shareholder, directors, attorneys and accountants, as necessary, through closing on a best efforts basis.

**V.**

**SSG'S QUALIFICATIONS AND DISINTERESTEDNESS**

8.  The Debtors have made a careful and diligent inquiry into the qualifications and competence of SSG and is advised that SSG is capable of providing the proper services in these proceedings.

9.  The Debtors have selected SSG based on its experience and expertise in providing investment banking services.  SSG's investment banking professionals have extensive experience in Chapter 11 cases and have served as investment bankers to numerous debtors, Chapter 11 trustees, creditors' committees, and buyers in Chapter 11 proceedings.

10.  Mr. Karlson has over twenty (10) years of special situation investment banking experience.  His experience includes providing sell-side investment banking services to companies in and out of bankruptcy in a variety of industries, including, without limitation, agriculture, retail, manufacturing and energy/natural resources.  Most recently, Mr. Karlson provided sell-side investment banking services in the sale of the assets of Stacy's, Inc., a large grower of perennials based in York, South Carolina, to an affiliate of Metrolina Greenhouses in August 2013.

11.  SSG is not a creditor, insider or affiliate of the Debtors and has never provided any services to the Debtors or their principals.

12.  The Debtors believe, and therefore aver, that the employment of SSG is necessary and in the best interest of the Debtors' estates.  A Verified Statement executed by SSG's Director, Matthew P. Karlson, asserting, among other things, that SSG does not hold any interest materially adverse to the Debtors' estates is attached hereto as **Exhibit B** and made a part hereof.

# VI.
## PROFESSIONAL COMPENSATION AND INDEMNIFICATION

13.    As compensation for providing the foregoing services, SSG shall receive the following:

A)    <u>Monthly Fee</u>. Monthly fees (the "**Monthly Fees**") of $25,000 per month payable on the first (1st) of each month beginning January 1, 2014.  SSG will credit the first three (3) Monthly Fees against any Transaction Fees, as defined below.

B)    <u>Sale Fee</u>.  Upon the consummation of a Sale Transaction, SSG shall be entitled to a fee (the "**Sale Fee**") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Sale equal to:  (a) $450,000 or (b) one and three quarters percent (1.75%) of Total Consideration (as such term is hereafter defined), whichever is greater.

Notwithstanding the foregoing, if the Company signs a definitive agreement for a Sale of all of its assets or control equity to any party on the Carve-Out List, then SSG's Sale Fee shall be $350,000.  However, in the event of a Chapter 11 proceeding, there shall be no reduced Sale Fee for a sale to any party on the Carve-Out List if an auction occurs and in such case, SSG shall be paid a full Sale Fee.

In addition, if the Company signs a definitive agreement for the Sale of the Colorado Property to an insider or a group affiliated with or related to an insider and such Sale is consummated outside of a Chapter 11 proceeding to such insider or a group affiliated with or related to an insider, then there shall be no Sale Fee relating to the Colorado Property.  However, in the event that the Colorado Property is sold to an insider through a Chapter 11 proceeding, then SSG's Sale Fee shall be $100,000.  In the event of a Sale of the Colorado Property to any non-insider, whether in Chapter 11 or otherwise, then SSG shall be paid a full Sale Fee.

C)    Financing Fee.  Upon the closing of a Financing Transaction, SSG shall be entitled to a fee ("**Financing Fee**") payable in cash, in federal funds via wire transfer or certified check at and as a condition of closing of such Financing, regardless of whether the Company chooses to draw down the full amount of the committed Financing at that time, equal to:   (a) $450,000 or (b) 2.0% of any Senior Debt (as such term is hereafter defined) raised from any financing source, plus 4.0% of any Tranche B/Secured Subordinated Debt or any Traditional Subordinated Debt (as such term is hereafter defined) raised, plus 6% of any Traditional Equity (as such term is hereafter defined) raised, whichever is greater.

D)    In addition to the foregoing Sale Fee, SSG will be entitled to accrue and seek reimbursement for all of SSG's reasonable out-of-pocket expenses incurred in the event of a Sale or Financing.

*See*, Exhibit "A".

14.    The fee structure identified herein (the "**Fee Structure**") is consistent with and typical of compensation arrangements entered into by SSG and other comparable firms in connection with the rendering of similar services under similar circumstances. The Debtors believe that the ultimate benefit of SSG's services cannot be measured by reference to the number of hours to be expended by SSG's professionals in the performance of such services. Indeed, the Debtors and SSG have agreed upon the Fee Structure in anticipation that (a) a substantial commitment of professional time and effort has been and will continue to be required of SSG in connection with this case, (b) such commitment may foreclose other opportunities for SSG, and (c) the actual time and commitment required of SSG and its professionals to perform its services under the Engagement Agreement may vary substantially from week to week and month to month, creating "peak load" issues for SSG.

14.    SSG will maintain records in support of any expenses incurred in connection with the rendering of its services in this case.  As all of SSG's compensation will be calculated and paid based on the Sale Fee, SSG requests that it not be required to file detailed time records.

**APPLICATION TO AUTHORIZE EMPLOYMENT OF SSG ADVISORS, LLC TO PROVIDE INVESTMENT BANKING SERVICES TO THE DEBTORS PURSUANT TO 11 U.S.C. § 327 AND 328 (a) EFFECTIVE AS OF THE PETITION DATE – Page 7**
Gardere01 - 6394663v.4

15.     The Sale Fee to be paid to SSG for services rendered and costs incurred on the Debtors' behalf shall be subject to and conditioned upon the approval of this Court pursuant to 11 U.S.C. § 330.

17.     The Debtors agrees to indemnify SSG in accordance with the indemnification provisions set forth in the Engagement Agreement.

## VII.
## AUTHORITY FOR THE RELIEF REQUESTED

18.     Section 363(b) of the Bankruptcy Code provides in relevant part that a debtor in possession "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  In the Fifth Circuit, a proposed use of property pursuant to section 363(b) is appropriate if "some articulated business justification" exists for the transaction.  *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re ASARCO LLC*, 441 B.R. 813, 823-24 (S.D. Tex. 2010) (stating that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *GBL Holding Company, Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Building Group, Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005) ("Great judicial deference is given to the [debtor in possession's] exercise of business judgment.").

19.     The Debtors' retention of SSG will benefit the Debtors' estates by providing them with objective and skilled professionals to assist in, among other things, evaluating and implementing sale and reorganization alternatives and providing other restructuring guidance. Accordingly, such employment is in the best interests of the Debtors' estates, creditors, and other parties in interest.

**APPLICATION TO AUTHORIZE EMPLOYMENT OF SSG ADVISORS, LLC TO PROVIDE INVESTMENT BANKING SERVICES TO THE DEBTORS PURSUANT TO 11 U.S.C. § 327 AND 328 (a) EFFECTIVE AS OF THE PETITION DATE – Page 8**
Gardere01 - 6394663v.4

20.     The Debtors request that the Court authorize the employment and indemnification of SSG under section 327 and 328 (a) of the Bankruptcy Code.

## VIII.
## NOTICE

21.     This Motion has been provided to (i) the United States Trustee; (ii) the thirty largest unsecured creditors of the Debtors on a consolidated basis; (iii) Regions Bank; (iv) Comerica Bank; (v) MCG Capital Corporation; (vi) the Internal Revenue Service; and (vii) all parties in interest who have requested notice.  The Debtors respectfully submit that no further notice of this Motion is required.

22.     The Pleadings in these cases and supporting papers are available on the Court's website at:  **ecf.txeb.uscourts.gov**.  You can also request any pleading you need from (i) the Debtors' website at:   www.upshotservices.com/colorstar, (ii) the claims agent at:   UpShot Services LLC, c/o Travis Vandell, 7808 Cherry Creek South Drive, Suite 112, Denver, Colorado 80231, (iii) UpShot Services LLC at:   855-812-6112, or (iv) counsel for the Debtors at the following address:  Gardere Wynne Sewell LLP, c/o Karen Oliver, 1601 Elm Street, Suite 3000, Dallas, Texas 75201 (koliver@gardere.com).

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court enter an Order authorizing the Debtors to engage SSG on the terms described above, and in the Engagement Contract, pursuant to section 327 and 328 (a) of the Bankruptcy Code and granting such other and further relief as the Court may deem just and proper.

DATED:  December 27, 2013          Respectfully submitted by:

*/s/ Marcus A. Helt*
Marcus A. Helt (TX 24052187)
Evan R. Baker (TX 24073879)
**GARDERE WYNNE SEWELL LLP**
3000 Thanksgiving Tower
1601 Elm Street
Dallas, TX 75201-4761
Telephone:  (214) 999-3000
Facsimile:  (214) 999-4667
mhelt@gardere.com
ebaker@gardere.com

# EXHIBIT A



SSG
ADVISORS, LLC

September 25, 2013

Mr. Brad Walker
Chief Restructuring Officer
Color Star Growers, Inc.
4122 Cowling Road
Sanger, TX 76266

Dear Mr. Walker:

This agreement ("Engagement Agreement") will serve as the contract between Color Star Growers, Inc. and its subsidiaries and controlled affiliates ("Color Star" or the "Company") and SSG Advisors, LLC ("SSG" or "Advisor") regarding the retention of SSG as exclusive investment banker to Color Star for the purposes outlined in this Engagement Agreement. SSG's responsibilities hereunder involve providing investment banking services to the Company on an exclusive basis focusing on: (i) the sale of all or part of Color Star (the "Sale"); (ii) the review of private placement alternatives to Color Star, including raising debt and/or equity capital (the "Financing"); and/or (iii) the restructuring of Color Star's balance sheet with existing stakeholders (the "Restructuring").

A.   **SSG's Role**

1.   **Sale.** SSG's role in connection with the Sale will include the following:

- Prepare an information memorandum describing Color Star, its historical performance and prospects, including existing contracts, marketing and sales, labor force, management and financial projections;

- Assist the Company in compiling a data room of any necessary and appropriate documents related to the Sale;

- Assist the Company in developing a list of suitable potential buyers who will be contacted on a discreet and confidential basis after approval by the Company;

- Coordinate the execution of confidentiality agreements for potential buyers wishing to review the information memorandum;

- Assist the Company in coordinating site visits for interested buyers, and work with the management team to develop appropriate presentations for such visits;

- Solicit competitive offers from potential buyers;

- Advise and assist the Company in structuring the Sale and negotiating the transaction agreements;

Mr. Brad Walker
September 25, 2013
Page 2

- Otherwise assist the Company and its other professionals, as necessary, through closing on a best efforts basis.

2. **Financing.** SSG's role in connection with a Financing will include the following:

- Advise, in light of current market conditions, on all aspects of the Financing, including timing, structure and terms;

- Conduct due diligence and complete an executive summary on the Financing, prepare a financing memorandum describing Color Star, its historical performance and prospects, including existing contracts, marketing and sales, labor force, and management and anticipated financial results of the Company;

- Approach potential lenders and investors, including commercial banks, commercial financing companies, private capital investment funds and other institutional investors;

- Solicit term sheets from those lenders and investors interested in the Financing;

- Negotiate with lenders and investors regarding the terms and structure of the Financing; and

- Otherwise assist the Company, its sole shareholder, directors, attorneys and accountants, as necessary, through closing on a best efforts basis.

3. **Restructuring.** SSG shall assist the Company in negotiating with existing stakeholders, including Regions Bank and MCG Capital, unsecured creditors, landlords and shareholders in regard to a potential Restructuring.

In performing the services described above, the Company will furnish or cause to be furnished to SSG such information as SSG reasonably believes appropriate to the execution of its engagement hereunder (all such information so furnished being the "Information"). Color Star represents to SSG that all Information furnished by it or its agents will be complete and correct in all material respects to the best of its knowledge and that until the expiration of SSG's engagement hereunder, it will advise the Company and SSG immediately of the occurrence of any event or any other change known by it or its agents that results in the Information ceasing to be complete and correct in all material respects. The Company recognizes and confirms that SSG: (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated hereby without having independently verified any of the same; (b) does not assume responsibility for accurateness or completeness of the Information and such other information; and (c) will not make an appraisal of any of the assets or liabilities of Color Star.

Mr. Brad Walker
September 25, 2013
Page 3

The Company agrees that SSG shall be its exclusive investment banker in connection with any Transaction undertaken with respect to Color Star during the Engagement Term, as defined below, of this Engagement Agreement.   The Company agrees that during the Engagement Term, SSG shall have the exclusive authority to initiate and conduct discussions and assist and advise the Company in its negotiations with all prospective purchasers, lenders and investors.   In that regard, the Company agrees to identify to SSG:  (a) all prospective purchasers, lenders and investors who have been in contact with Color Star prior to the date hereof and (b) all prospective purchasers, lenders and investors who come in contact with the Company during the Engagement Term (collectively, the "Carve-Out List").  Notwithstanding anything in this Engagement Agreement to the contrary, the Company retains the authority, along with SSG, to communicate with all persons on the Carve-Out List.

SSG will consult with and advise the Company with respect to the financial aspects of any proposed Transaction, including price, terms and conditions of a Transaction. SSG will not, however, have any authority to bind the Company with respect to any proposed Transaction.    Likewise, nothing contained herein shall require the Company to accept the terms of any proposal and the Company shall at all times have the right in its sole and absolute discretion to reject any proposed Transaction regardless of the terms proposed.

B.    **SSG's Compensation**

As compensation for providing the foregoing services, SSG shall receive the following:

1.    <u>Initial Fee</u>.  An initial fee (the "Initial Fee") equal to $25,000 due upon signing this Engagement Agreement.

2.    <u>Monthly Fees</u>.  Monthly fees (the "Monthly Fees") of $25,000 per month payable on the first (1st) of each month beginning November 1, 2013.  SSG will credit the first three (3) Monthly Fees against any Transaction Fees, as defined below.

3.    <u>Sale Fee</u>.  Upon the consummation of a Sale Transaction, SSG shall be entitled to a fee (the "Sale Fee") payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Sale equal to:  (a) $450,000 or (b) one and three quarters percent (1.75%) of Total Consideration (as such term is hereafter defined), whichever is greater.

Notwithstanding the foregoing, if the Company signs a definitive agreement for a Sale of all of its assets or control equity to any party on the Carve-Out List, then SSG's Sale Fee shall be $350,000.  However, in the event of a Chapter 11 proceeding, there shall be no reduced Sale Fee for a sale to any party on the Carve-Out List if an auction occurs and in such case, SSG shall be paid a full Sale Fee.

In addition, if the Company signs a definitive agreement for the Sale of the Colorado Property to an insider or a group affiliated with or related to an insider and such Sale is consummated outside of a Chapter 11 proceeding

Mr. Brad Walker
September 25, 2013
Page 4

to such insider or a group affiliated with or related to an insider, then there shall be no Sale Fee relating to the Colorado Property. However, in the event that the Colorado Property is sold to an insider through a Chapter 11 proceeding, then SSG's Sale Fee shall be $100,000. In the event of a Sale of the Colorado Property to any non-insider, whether in Chapter 11 or otherwise, then SSG shall be paid a full Sale Fee.

SSG's Sale Fee shall be paid directly from the Sale proceeds as a direct carve out prior to payment of any super-priority claim, secured claim or administrative claim.

4.   Financing Fee. Upon the closing of a Financing Transaction, SSG shall be entitled to a fee ("Financing Fee") payable in cash, in federal funds via wire transfer or certified check at and as a condition of closing of such Financing, regardless of whether the Company chooses to draw down the full amount of the committed Financing at that time, equal to:  (a) $450,000 or (b) 2.0% of any Senior Debt (as such term is hereafter defined) raised from any financing source, plus 4.0% of any Tranche B/Secured Subordinated Debt or any Traditional Subordinated Debt (as such term is hereafter defined) raised, plus 6% of any Traditional Equity (as such term is hereafter defined) raised, whichever is greater.

5.   Restructuring Fee. Upon the closing of a Restructuring Transaction, SSG shall be entitled to a fee ("Restructuring Fee") equal to $400,000, which shall be paid from operating cash flow, available cash, new funds, or otherwise prior to payment to any super priority claim, secured claim or administrative claim.

6.   No Duplication of Fees. Notwithstanding anything herein to the contrary, none of the fees in Section B(1)-(5) shall be duplicative; only one fee will apply. For example, if the sub-debt converts to equity and SSG raises new capital (either debt or equity), then SSG would get the greater of the Financing Fee and the Restructuring Fee. But it would not be entitled to the Restructuring Fee and the Financing Fee. In addition, if SSG obtains a sale of the Colorado Property to an insider of the Company through a Chapter 11 proceeding, SSG will receive a $100,000 sale fee. Then, if subsequently the remainder of the Company restructures, and SSG earns a Restructuring Fee under this Engagement Agreement, then SSG will be entitled to the Restructuring Fee of $400,000 in addition to the $100,000 Sale Fee.

7.   In addition to the foregoing Initial Fee, Monthly Fee and Transaction Fees noted above, whether or not a Transaction is consummated, SSG will be entitled to reimbursement for all of SSG's reasonable out-of-pocket expenses incurred in connection with the subject matter of this Engagement Agreement

C.   **Definitions**

For the purpose of this Engagement Agreement:

Mr. Brad Walker
September 25, 2013
Page 5

**Active and Substantive Negotiations** means negotiations with SSG and the other party in which SSG (i) made disclosures to the other party and (ii) received a confidentiality agreement from the other party.

**Financing Transaction** means funds received by Color Star from any senior debt, secured subordinated debt, unsecured subordinated debt or non-control equity from any lender or investor.

**Restructuring Transaction** means and includes any restructuring of existing and prospective Company stakeholder claims, including but not limited to the Company's secured lenders, unsecured claims and shareholders prospective.

**Sale Transaction** means and includes any transaction involving the sale or transfer, directly or indirectly, of all or substantially all of the assets, secured debt or control equity of Color Star.

**Senior Debt** means funds:  (a) received or to be received by the Company, or any entity acquired or controlled by or under common control with the Company, in the form of revolving credit facilities, notes, term loans, lines of credit, offering lines, purchase and sale of accounts receivable facilities, or any other type of credit facility, including a stretch senior and unitranche facility, for which the Company or any entity acquired or controlled by or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate, without any profit participation or yield enhancement as a return on the repayment of the funds received by the Company, or any entity acquired or controlled by or under common control with the Company; and (b) for which the lender has a claim to or lien on the assets of the Company, or any entity acquired or controlled by or under common control with the Company, superior or prior to the claim of the holders of any Subordinated Debt.

**Total Consideration** shall mean the purchase price paid for the equity, assets or secured debt, or any portion of either plus the assumption or payoff of indebtedness and/or payables.

**Traditional Equity** shall include, but not be limited to, common stock preferred stock, convertible stock, and the proceeds from any joint venture agreement, including contributions by a joint venture partner involving cash, stock, property, plant and equipment or any other assets or asset sale.

**Traditional Subordinated Debt** means:  (a) funds: (i) received or to be received by the Company, or any entity acquired or controlled by or under common control with the Company, or for which the Company, or any entity acquired or controlled by or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance therefore at a fixed interest rate or a floating rate; and (ii) for which the lender does not have a claim to or lien on the assets of the Company, or any entity acquired or controlled by or under common control with the Company; or (b) funds: (i) received or to be received by the Company, or any entity acquired or controlled by or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate; and (ii) for

Mr. Brad Walker
September 25, 2013
Page 6

which part of the overall return to the investor on these funds is anticipated to consist of a participation in the profits of the Company and/or some other type of income enhancement (whether realized through equity warrants conversions of the debt to equity, or otherwise) which has the effect of raising the overall return on these funds to the investors above the level that could be realized solely due to the receipt of stated interest income.

**Tranche B/Secured Subordinated Debt** means: (a) funds: (i) received or to be received by the Company, or any entity acquired or controlled by or under common control with the Company, or for which the Company, or any entity acquired or controlled by or under common control with the Company, is obligated to repay the funds on a fixed schedule with interest on the unpaid balance therefore at a fixed interest rate or a floating rate, and (ii) for which the lender may have a claim to or lien on the assets of the Company, or any entity acquired or controlled by or under common control with the Company, senior to or on parity with or junior to the claim of the holders of Senior Debt.

**Transaction** shall mean and include a Sale, Financing and Restructuring, as determined above.

**Transaction Fee** shall mean and include a Sale Fee, Financing Fee and Restructuring Fee.

D.    **Term of Engagement**

This Engagement Agreement shall remain in force (the "Engagement Term") for a period of five (5) months from the date of signing this Engagement Agreement and may thereafter be terminated by either party upon thirty (30) days prior written notice to the other; provided, however, that either party may terminate this Engagement Agreement by written notice immediately upon the closing of a Transaction. Upon the termination of this Engagement Agreement, neither party shall have any further obligations to the other except that: (a) termination of the Engagement Agreement shall not affect SSG's right to indemnification under the Indemnification paragraph below; (b) the Company shall remain obligated to pay SSG any unpaid Monthly Fees and to reimburse SSG for any expenses incurred through the date of the termination of the Engagement Agreement; and (c) if a Transaction to a party (i) not on the Carve-Out List and (ii) with whom SSG had Active and Substantive Negotiations prior to termination of this Engagement Agreement is consummated within nine (9) months ("Trailer Term") of the termination of this Engagement Agreement, the Company shall remain obligated to pay a Sale Fee, Financing Fee or Restructuring Fee, as calculated above. Sections B, D, E, F and G (entitled Compensation, Term of Engagement, Indemnification, Miscellaneous, and Scope of Duties, respectively) of this Engagement Agreement shall survive the expiration or termination of this Engagement Agreement indefinitely. Notwithstanding anything in this Engagement Agreement to the contrary, upon termination of this Engagement Agreement, SSG must provide the Company with a list of those persons who fit within (c)(i)-(ii).

Mr. Brad Walker
September 25, 2013
Page 7

E.    **Indemnification**

The Company hereby acknowledges and agrees to the indemnification arrangements between the parties hereto as described on Attachment A hereto, which Attachment is incorporated herein and forms an integral part hereof.

F.    **Confidentiality**

Advisor agrees to keep confidential all non-public information obtained from Color Star.  Advisor agrees that neither it nor its officers, members, principals, affiliates, independent contractors and their respective directors, officers, agents and employees or attorneys (the "Confidential Parties") will disclose to any other person or entity, except to agents of Color Star, or use for any purpose other than as specified herein, any information pertaining to Color Star or any affiliate thereof that is either non-public, confidential or proprietary in nature ("Confidential Information") that it obtains or is given access to during the performance of the services provided for hereunder, except to parties that are bound by a similar confidentiality obligation or are parties-in-interest in relation to Color Star.  Advisor may, however, make reasonable disclosure of Confidential Information to third parties in connection with their performance of their obligations and assignments hereunder.  In addition, for purposes of this Agreement, the Confidential Information does not include information that (i) is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties, (ii) was available to the Confidential Parties on a non-confidential basis prior to its disclosure to the Confidential Parties pursuant to this Agreement, or (iii) becomes available to the Confidential Parties on a non-confidential basis from a source other than Color Star, provided that the source is not bound by a confidentiality agreement with, or other obligation of confidentiality to, Color Star.

Should the Confidential Parties be requested or required, by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand, court order or other process issued by a court of competent jurisdiction or any federal or state agency or administrative review board to which the Confidential Parties are or may be subject, to disclose any or all of the Confidential Information, the Confidential Parties will promptly provide written notice of same to Color Star so that Color Star may seek a protective order or other appropriate remedy.  In no event will Confidential Parties disclose more than that portion of the Confidential Information that is legally required and the Confidential Parties shall cooperate with Color Star in its effort to obtain a protective order or other assurance that the Confidential Information will not be disclosed, or, if it is disclosed, will be disclosed in such a manner as to limit to the greatest extent possible the number of persons who are granted access to the Confidential Information.

G.    **Miscellaneous**

No fee payable to any other financial advisor or finder by Color Star or the Company in connection with the subject matter of this Engagement Agreement shall reduce or otherwise affect any fee payable to SSG hereunder.  This Engagement Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and supersedes and cancels any prior communications, understandings and agreements between the parties hereto.  This Engagement Agreement cannot be

Mr. Brad Walker
September 25, 2013
Page 8

modified or changed, nor can any of its provisions be waived, except by written agreement signed by both parties. The benefits of this Engagement Agreement shall inure to the respective successors and assigns of the parties hereto and of the Indemnified Parties and their respective successors, assigns and representatives, and the obligations and liabilities assumed in this Engagement Agreement by the parties hereto shall be binding upon their respective successors and assigns.

This Engagement Agreement may be executed in any number of counterparts, which counterparts, taken together, shall constitute one and the same Engagement Agreement.

H.   **Scope of Duties**

The Company hereby acknowledges and agrees that: (a) it has retained SSG for the purposes set forth in this Engagement Agreement and that the rights and obligations of the parties hereto are contractual in nature; and (b) SSG has not made any warranties or guarantees of any nature with respect to the success or satisfactory conclusion of any Transaction or as to the economic, financial or other results which may be obtained or experienced by the Company as a result thereof. Both the Company and SSG disclaim any intention to impose fiduciary duties or obligations on the other by virtue of the engagement contemplated by this Engagement Agreement and no other person or entity shall have any rights or obligations hereunder except as expressly provided herein.

I.   **Bankruptcy Court Proceedings**

In the event the Company files one or more Chapter 11 bankruptcy proceedings, either voluntary or involuntary, during the Engagement Term, the Company shall use its commercially reasonable efforts to have SSG employed upon the same or substantially similar terms and shall have this Engagement Agreement and SSG's retention as the Company's exclusive investment banker approved by a Court of competent jurisdiction.

J.   **Other Matters**

The Company agrees that SSG has the right, following the Sale, Financing or Restructuring closing, to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company hereunder.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), SSG is required to obtain, verify and record information that identifies its clients, which information may include the name and address of the Company, Color Star as well as its senior management team as well as other information that will allow SSG to properly identify its clients. Additionally, SSG maintains important disclosures on the web site www.ssgca.com. These disclosures may be updated periodically on an as-needed basis. The Company agrees to accept and receive all of these disclosures by electronically accessing the website referenced above and acknowledges that printed hard copies of these disclosures are available upon request by contacting SSG directly at (610) 940-1094.

Mr. Brad Walker
September 25, 2013
Page 9

K.   **Securities Platform**

All transactions involving the sale or purchase of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under) are offered through SSG Capital Advisors, LLC. ("SCA"), an affiliated Pennsylvania corporation and registered Broker-Dealer in good standing with the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC"). Principals of SSG are registered representatives of SCA. Therefore, SCA is included collectively as "SSG" with all the rights and obligations thereto under the terms of this Engagement Agreement.

To the extent a Transaction Fee is payable to SSG in connection with Transaction constituting the purchase or sale of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under), such Transaction Fee shall be specifically paid to SCA. Under no circumstance will the Company be obligated to pay a fee in an aggregate amount in excess of the amount provided in this Engagement Agreement. Payment of the fee to SCA shall constitute and be deemed payment of the fee in this Engagement Agreement.

Mr. Brad Walker
September 25, 2013
Page 10

Any amendment, modification or other changes to this Engagement Agreement must be
in writing and signed by both parties to be enforceable.

Please indicate your acceptance of the foregoing by executing and returning the enclosed
copy of this letter.

**SSG ADVISORS, LLC**

By: _____                  _____

     J. Scott Victor                                  Matthew P. Karlson
     Managing Director                            Managing Director

ACCEPTED:

**COLOR STAR GROWERS, INC.**

By: _____                  9/25/2013
     Brad Walker                                      _____
     Chief Restructuring Officer                Date

Mr. Brad Walker
September 25, 2013
Page 11

## ATTACHMENT A
## INDEMNIFICATION PROVISIONS

The Company agrees to indemnify, defend and hold harmless SSG and SCA and its affiliates, the respective partners, members, directors, officers, agents and employees of SSG and its affiliates and each other person, if any, controlling SSG or its affiliates (the foregoing being referred to herein individually as an "Indemnified Party" and collectively as the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities or costs, as and when incurred, to which such Indemnified Party may become subject to or which are asserted against any Indemnified Party, directly or indirectly, in any way related to SSG's acting for the Company under the Engagement Agreement of which this Attachment A forms a part, including, without limitation, in connection with:  (a) any act or omission by SSG related to its engagement as financial advisor under the Engagement Agreement; or (b) SSG's acceptance, or its performance or non-performance, of its obligations under said Engagement Agreement.   The Company will reimburse the Indemnified Parties for any legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages or liabilities or any action in respect thereof, whether or not in connection with pending or threatened litigation, and whether or not any Indemnified Party is a party thereto; provided, however, that the Company shall not be liable under the foregoing indemnity agreement in respect of any liability to the extent that such liability is found in a final judgment by a court of competent jurisdiction, not subject to further appeal, to have resulted primarily from SSG's gross negligence or willful misconduct in the performance of its duties under said Engagement Agreement.   The Company agrees that reliance by SSG on the information supplied by the Company to SSG in connection with said Engagement Agreement or any directions furnished by the Company shall not constitute negligence, bad faith or willful misconduct by SSG.

In order to provide for just and equitable contribution, if a claim for indemnification is made pursuant to said Engagement Agreement but it is found in a final judgment by a court of competent jurisdiction, not subject to further appeal, that such indemnification may not be enforced in such case, the Indemnified Parties, on the one hand, and the Company, on the other hand, shall each contribute to the amount paid or payable as a result of such losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnified Parties, on the one hand, and the Company, on the other hand, and the relative benefits to the Indemnified Parties, on the one hand, and the Company, on the other hand, arising out of the particular matter or transaction which gave rise to such loss, claim, damage, liability or costs, and all other relevant equitable considerations shall also be taken into account.   No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation.

The provisions of this Attachment A shall survive any termination of said Engagement Agreement.

Mr. Brad Walker
September 25, 2013
Page 12

### CARVE OUT LIST

# Renovo Capital LLC
# Metrolina Greenhouses

# EXHIBIT B

Marcus A. Helt (TX 24052187)
Evan R. Baker (TX 24073879)
**GARDERE WYNNE SEWELL LLP**
3000 Thanksgiving Tower
1601 Elm Street
Dallas, TX 75201-4761
Telephone:  (214) 999-3000
Facsimile:  (214) 999-4667
mhelt@gardere.com
ebaker@gardere.com

**PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS-IN-POSSESSION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **COLOR STAR GROWERS OF** | § | **Case No. 13-42959** |
| **COLORADO, INC., VAST, INC., and** | § | |
| **COLOR STAR, LLC,** | § | **(Jointly Administered)** |
| | § | |
| **Debtors.** | § | |

**VERIFIED STATEMENT OF MATTHEW P. KARLSON IN
SUPPORT OF APPLICATION OF DEBTORS TO EMPLOY SSG
ADVISORS, LLC AS INVESTMENT BANKERS PURSUANT
TO 11 U.S.C. §§ 327 AND 328 AND FED.R.BANKR.P. 2014**

I, Matthew P. Karlson, hereby declare under penalty of perjury, and in connection with the above-captioned Chapter 11 bankruptcy cases, that the following facts are true and correct to the best of my knowledge, information and belief:

1.      I am a Director for SSG Advisors, LLC ("**SSG**").

2.      SSG has no connection with the Debtors, their creditors or any other party in interest.

**DECLARATION OF TERRY KOHLER IN SUPPORT OF APPLICATION TO AUTHORIZE
EMPLOYMENT OF SSG CAPITAL ADVISORS, LLC TO PROVIDE INVESTMENT BANKING
SERVICES TO THE DEBTORS PURSUANT TO 11 U.S.C. § 363 EFFECTIVE AS OF THE PETITION
DATE - PAGE 1**

3.      SSG does not hold nor represent any interests adverse to the Debtors, their creditors or estates in these matters, and is a disinterested person within the meaning of 11 U.S.C. § 101(14) in that SSG, its members and associates:

      a.      are not creditors, equity security holders or insiders of the Debtors;

      b.      are not and were not, within two (2) years before the date of this Verified Statement, a director, officer or employee of the Debtors;

      c.      do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

4.      Pursuant to § 504 of the Bankruptcy Code, no agreement or understanding exists between SSG or any other person to share any compensation or reimbursement of expenses to be paid to SSG in this proceeding.

5.      To the best of my knowledge at this time, SSG has no connection with the Debtors, their creditors or any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the Office of the United States Trustee.

**SSG ADVISORS, LLC**

By: _____

           Matthew P. Karlson
           Managing Director

Dated: December 27, 2013

**DECLARATION OF TERRY KOHLER IN SUPPORT OF APPLICATION TO AUTHORIZE EMPLOYMENT OF SSG CAPITAL ADVISORS, LLC TO PROVIDE INVESTMENT BANKING SERVICES TO THE DEBTORS PURSUANT TO 11 U.S.C. § 363 EFFECTIVE AS OF THE PETITION DATE - PAGE 2**